RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ADVANCE SIGN GROUP, LLC,
                    *Plaintiff-Appellee*,

    *v.*

OPTEC DISPLAYS, INC.,
                    *Defendant-Appellant*.

No. 12-3321

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:07-cv-380—Edmund A. Sargus, Jr., District Judge.

Argued: January 24, 2013

Decided and Filed: July 15, 2013

Before: MARTIN, SUHRHEINRICH, and GIBBONS, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Charles A. Koenig, Columbus, Ohio, for Appellant. Charles H. Cooper, Jr., COOPER & ELLIOTT, LLC, Columbus, Ohio, for Appellee. **ON BRIEF:** Charles A. Koenig, Columbus, Ohio, for Appellant. Charles H. Cooper, Jr., Rex H. Elliott, COOPER & ELLIOTT, LLC, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

      BOYCE F. MARTIN, JR., Circuit Judge. Advance Sign Group, LLC, brought this diversity action against Optec Displays, Inc., for breach of contract, unjust enrichment, and tortious interference after a business arrangement between the two parties went awry. A jury found in favor of Advance Sign on the breach of contract and tortious interference claims, and awarded damages to Advance Sign. Optec filed a post-trial motion for judgment as a matter of law concerning Advance Sign's breach of

contract and tortious interference claims.  Optec also moved for a new trial, or in the alternative, for a remittitur on damages.  The district court denied Optec's motions and Optec appeals the district court's judgment.  For the following reasons, we AFFIRM the district court.

## I.

Advance Sign manufactures, installs, and services commercial signs.  Optec manufactures a type of commercial sign known as an electronic messaging center. Advance Sign alleges that in 2005, James Wasserstrom, the President of Advance Sign, entered into an agreement with Bill McHugh, Optec's then Vice President of Sales, whereby Optec and Advance Sign would partner to sell Optec's electronic messaging signs to Advance Sign's customers in the foodservice industry.  As part of the agreement, Optec agreed to sell the signs to Advance Sign at discounted prices, Advance Sign agreed to sell only Optec's signs, and Optec agreed not to sell directly to the foodservice companies introduced to it by Advance Sign.

Darrell Rogers, one of the largest franchisees of Sonic Restaurants, a fast food chain, was a long-standing customer of Advance Sign.  In late 2005, after Advance Sign pitched the idea to Rogers and Sonic, Advance Sign and Optec participated in a pilot project to install electronic messaging signs at several Sonic corporate-owned locations and franchise locations owned by Rogers.  Optec provided the electronic messaging signs and Advance Sign provided the installation services.  The purpose of the project was to determine whether the use of the electronic messaging signs could increase sales for Sonic.  The pilot program was successful, and Sonic became interested in purchasing the electronic messaging signs for its corporate locations.

Advance Sign alleges that Optec violated the 2005 agreement when, in the first quarter of 2006, Optec began negotiating with Sonic Restaurants for the direct sale of its electronic messaging signs.  In an attempt to salvage the business relationship and after negotiating from March through May of 2006, Advance Sign and Optec came to a second agreement during a telephone conference. Optec agreed to pay Advance Sign twelve percent of the net invoice price on all sales made by Optec to the foodservice

customers introduced to it by Advance Sign. Wasserstrom and Roger Wallace, Advance Sign's Chief Operating Officer and Chief Financial Officer, claimed that McHugh orally agreed to the terms during the phone call. On June 1, 2006, Advance Sign sent McHugh a letter memorializing the terms to which the parties allegedly agreed over the phone. McHugh made a minor change to the letter that was unrelated to the twelve percent commission figure, and Advance Sign incorporated the change and sent the letter back to McHugh on June 6, 2006. McHugh never signed the letter.

When McHugh refused to sign, Advance Sign representatives traveled to Optec's offices in California in August of 2006 to have a meeting about the commission agreement. Optec's President, Shu Wu, was present at the meeting. During the meeting, the parties discussed an arrangement that would make Advance Sign the primary sales agent for all of Optec's foodservice industry clients, regardless of whether Optec attained the client with the help of Advance Sign. In exchange for Advance Sign playing a larger role than had been discussed during the call with McHugh, the parties talked about Advance Sign receiving less than a twelve percent commission on Optec's sales to Sonic. The parties never agreed on the appropriate commission rate. Advance Sign put the discussed terms in writing, including a requirement that Optec pay Advance Sign a two percent commission on all sales to Sonic, and sent the agreement to Optec. Optec failed to sign the August agreement, and it failed to pay the commission required under either the June or August iteration of the commission contract.

On November 21, 2006, Wasserstrom sent an email to Wu complaining that Optec had not honored its obligations under the commission agreement. Wasserstrom concluded the email by warning Wu that he would not wait much longer for Optec to keep its promises. Six days later, on November 27, 2006, Shawn Klinger, Optec's National Accounts Manager, sent an email to Steve Reed, Sonic's Vice President. In the email, Klinger explained that Advance Sign was the cause of some of the problems associated with the installation of Optec's signs at various Sonic locations. In particular, he claimed that Advance Sign had used non-preferred installation vendors against Optec's recommendation and that many of Advance Sign's installers were incapable of

performing the installations. The email went on to say that the best way to resolve the installation issues would be to allow Sonic to manage all aspects of the project, including installation. Klinger reported directly to McHugh, and he presented McHugh with a draft of the email prior to sending it to Reed. On January 22, 2007, Reed recommended to Optec that Advance Sign be removed from the project and gave Optec the right to perform the installations. Subsequently, Optec signed a two-year agreement with Sonic providing that Optec would be an approved supplier for two years. Optec went on to install signs at approximately 1,400 of Sonic's corporate locations.

Advance Sign sued Optec for breach of the original 2005 agreement as well as for breach of the 2006 agreement to pay Advance Sign a commission on Optec's sales to Sonic. Advance Sign also brought unjust enrichment and tortious interference claims against Optec. Following a jury trial, the jury found in favor of Advance Sign on both of its breach-of-contract claims and its claim for tortious interference. The jury did not award Advance Sign damages for Optec's breach of the original 2005 agreement, but it awarded Advance Sign damages in the amount of $3,444,000 for Optec's breach of the 2006 commission agreement. The jury based its damages calculation on the June iteration of the commission agreement. The jury also awarded Advance Sign $1,029,000 in damages for the tortious interference claim.

Optec filed post-trial motions. Optec moved for judgment as a matter of law regarding Advance Sign's claims for breach of the commission agreement and tortious interference. Optec also moved for a new trial, or in the alterative, for a remittitur on damages. The district court denied both motions. Optec appeals the district court's denial of its motions and, in doing so, makes several challenges to the jury's verdict. Optec claims: 1) that there was no meeting of the minds as to the June commission agreement; 2) that Ohio's Statute of Frauds precludes the enforcement of the commission agreement; 3) that Advance Sign did not establish all of the elements of its tortious interference claim; and 4) that the evidence did not support either of the jury's damages awards.

II.

Optec argues that the district court erred in denying its motion for judgment as a matter of law regarding Advance Sign's claims for breach of the commission agreement and tortious interference.

This Court reviews the District Court's denial of a Rule 50(b) motion de novo. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir.1996) (citing *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)). When exercising diversity jurisdiction, we resolve legal questions by applying the federal standard, and we resolve questions regarding the sufficiency of the evidence by using the standard applicable under the law of the forum state, which is Ohio in this case. *Id.* at 174–76. The evidence and facts must be construed most strongly in favor of the nonmoving party, and when reasonable minds may reach different conclusions, the motion must be denied. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001) (citing *K & T Enters.*, 97 F.3d at 174–76; *Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 532 (6th Cir. 2000) (quoting *Posin v. A.B.C. Motor Court Hotel, Inc.*, 344 N.E.2d 334, 338 (Ohio 1976)). We do not reweigh the evidence or assess the credibility of witnesses. *Gray*, 263 F.3d at 600 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *Cardinal v. Family Foot Care Ctrs., Inc.*, 532 N.E.2d 162, 164 (Ohio Ct. App. 1987). Moreover, the jury verdict is given great deference. *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007); *Seasons Coal Co. v. Cleveland*, 461 N.E.2d 1273, 1276 (Ohio 1984).

A.      Breach of the 2006 Commission Agreement

Optec makes two arguments in support of its claim that the district court erred in denying its motion for judgment as a matter of law concerning Advance Sign's claim for breach of the commission agreement. First, it argues that the evidence does not support the jury's finding that there was a meeting of the minds regarding the June iteration of the commission contract. Second, Optec argues that the Statute of Frauds precludes enforcement of the June iteration of the contract.

With regard to Optec's meeting-of-the-minds argument, parties cannot enter into an enforceable contract unless they come to a meeting of the minds on the essential terms of the contract. *Alligood v. Proctor & Gamble Co.*, 594 N.E.2d 668, 669 (Ohio Ct. App. 1991) (citing *Noroski v. Fallet*, 442 N.E.2d 1302, 1304 (Ohio 1982)). The burden of establishing a contract rests upon the party who asserts existence of the agreement. *Guardian Alarm Co. v. Portentoso*, 963 N.E.2d 225, 230 (Ohio Ct. App. 2011) (citing *Lynd v. Sandy & Beaver Val. Farmers Mut. Ins. Co.*, 145 N.E.2d 453, 455 (Ohio Ct. App. 1957)).

The concepts of "mutual assent" and "meeting of the minds" have been used interchangeably in Ohio case law. *Costner Consulting Co. v. U.S. Bancorp*, 960 N.E.2d 1005, 1009–10 (Ohio Ct. App. 2011) (citation omitted). Manifestation of mutual assent requires that each party make a promise or begin to render performance. *Id.* at 1010 (citing *Precision Concepts Corp. v. Gen. Emp. & Triad Personnel Servs., Inc.*, No. 00AP-43, 2000 WL 1015114, at *2 (Ohio Ct. App. July 25, 2000) (citation omitted)). "The 'manifestation of assent may be made wholly or partly by written or spoken words, or by other acts or the failure to act.'" *Id.* (quoting *Precision Concepts Corp.*, 2000 WL 1015114, at *2). "Whether there has been a manifestation of mutual assent and/or a meeting of the minds is a question of fact to be determined from all the relevant facts and circumstances." *Id.* (citing *Matusoff & Assocs. v. Kuhlman*, No. 98AP-1405, 2000 WL 192449, at *3 (Ohio Ct. App. Sept. 28, 1999)).

As an initial matter, there was manifestation of mutual assent because each party made a promise or began to render performance: Advance Sign had already rendered performance by introducing Optec to several of its foodservice industry clients, and Optec made the promise to pay Advance Sign a twelve percent commission on the net invoice price for all sales to Sonic. The fact that Optec made the promise over the phone is inconsequential because the manifestation of mutual assent can be made orally.

The relevant facts and circumstances further support a finding that Advance Sign and Optec mutually assented to a commission agreement in June 2006. First, prior to the phone call establishing the twelve percent commission, the parties engaged in

negotiations for nearly three months about a commission agreement. Second, Wallace and Wasserstrom testified that McHugh agreed to a twelve percent commission on Sonic-related business and other foodservice accounts that Advance Sign had provided Optec, with Wasserstrom testifying that there was "no doubt" in his mind that the parties had reached an agreement. Third, when Optec sent McHugh the June agreement for him to sign, McHugh made a minor change to the agreement instead of repudiating the agreement entirely or making a change to the twelve percent commission figure. Fourth, Wallace testified that the August 2006 trip to California would not have been necessary if Optec has simply honored the agreement. In light of such facts, reasonable minds could differ as to whether there was a meeting of the minds; therefore, the jury's determination must stand.

Optec argues in the alternative that, if this Court finds that the evidence supports the jury's determination that there had been a meeting of the minds regarding the June 2006 agreement, then it was unreasonable for the jury find that there had not been a meeting of the minds as to the August agreement. This argument is unpersuasive because attendees of the August meeting testified that the parties never came to a conclusion on the appropriate commission rate during the meeting in California. Based on that testimony alone, a reasonable jury could conclude that there had been no meeting of the minds regarding the August agreement, and that the June agreement was the operative agreement.

We now turn to Optec's argument that the June commission agreement is unenforceable because it falls within the Statute of Frauds. The Ohio Statute of Frauds, Ohio Rev. Code § 1335.05, reads as follows:

> No action shall be brought whereby to charge the defendant . . . upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note therefore, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

The Ohio Supreme Court has held that "where the time for performance under an agreement is indefinite, or is dependent upon a contingency which may or may not happen within a year, the agreement does not fall within the Statute of Frauds." *Sherman v. Haines*, 652 N.E.2d 698, 700 (Ohio 1995) (citing *Nonamaker v. Amos*, 76 N.E. 949, 951–52 (Ohio 1905) (citations omitted)). The Ohio Court of Appeals has held that an agreement does not fall within the Statute of Frauds if, at the time of making the agreement, there is a possibility that the agreement can be entirely performed as the parties intended within a year. *Weiper v. W.A. Hill & Assocs.*, 661 N.E.2d 796, 805–06 (Ohio Ct. App. 1995) (citing *Bryan v. Looker*, 640 N.E.2d 590, 594 (Ohio Ct. App. 1995)) (citation omitted); *Ford v. Tandy Transp., Inc.*, 620 N.E.2d 996, 1007–08 (Ohio Ct. App. 1993).

In light of *Sherman*, we hold that the June commission agreement does not fall within the Statute of Frauds. The June agreement was an agreement of indefinite duration. Further, at the time that Advance Sign and Optec made the agreement, there was a possibility that the agreement could be performed within a year of its execution. In June of 2006, it was unknown how many electronic messaging signs Sonic would purchase from Optec and for what duration of time. Optec's two-year agreement with Sonic does not factor into our analysis because it did not arise until more than seven months later, in January 2007. Still, even if we were to consider the January 2007 agreement, it is arguable that the June 2006 commission agreement still could have been performed within a year. Optec's agreement with Sonic merely provided that Optec would be an approved supplier for two years. Optec's agreement with Sonic did not state that Sonic was bound to make purchases from Optec over that two-year period. The district court did not err in denying Optec's motion as to the breach of contract claim.

B.     Tortious Interference

Optec argues that the district court erred in denying its motion as a matter of law regarding Advance's Sign's tortious-interference claim because Advance Sign did not establish all of the claim's elements.

Advance Sign claimed that Optec interfered with its business relationship with Sonic, resulting in Sonic deciding to discontinue using Advance Sign's installation services for Optec's electronic messaging signs. The district court instructed the jury that, in order to find for Advance Sign on its tortious interference claim, the jury must find by the greater weight of the evidence that:

> (1) there were existing or prospective contractual or business relationships between Advance Sign and Sonic Restaurants, Inc., D.L. Rogers, and other Sonic franchisees; and (2) Optec knew of the business or contractual relationships; and (3) Optec intentionally acted with the purpose to interfere with Advance Sign's business or contractual relationships; (4) Optec lacked a justification; and (5) Advance Sign was injured as a proximate result of the acts of Optec.

*See also Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995). Optec claims that the evidence does not support that Advance Sign established the third, fourth, and fifth factors.

Optec argues that the only evidence supporting the third factor—intentional interference with Advance Sign's business or contractual relationships—is the email from Klinger to Reed criticizing Advance Sign's handling of the installation process. Optec claims that the email was sent for the purpose of making suggestions for improving the installation process, not for the purpose of interfering with Advance Sign's business relationship with Sonic. As the district court pointed out, however, on its face, the email displays an intention to take the installation business away from Advance Sign. In the email, Optec asks for the right to manage all aspects of the project, including installation. Sonic granted Optec's request two months later and granted Optec the authority to install the electronic messaging signs. In addition, Klinger sent the email merely days after Wasserstrom sent Wu an email accusing Optec of breaching its obligations under the commission agreement. The content of the email, and its proximity in time to Wasserstrom's email, support the jury's finding that Klinger's email was an intentional act done with the purpose of interfering with Advance Sign's installation business with Sonic.

Concerning the fourth factor—that Optec lacked justification—the jury instructions explained that "'[l]acked a justification' means that Optec's interference with the business or contractual relationship was improper." The justification element can be defeated if a party exercises its right to assert a legally protected interest in good faith. *Bridge v. Park Nat'l Bank*, 903 N.E.2d 703, 708 (Ohio Ct. App. 2008) (citations omitted). Optec claims that it was protecting its reputation after Sonic expressed concerns regarding sign installations.

The jury could have reasonably believed Optec was not acting in good faith. First, Optec was already in breach of at least one agreement with Advance Sign—the original 2005 agreement. Second, Wasserstrom testified that the criticisms about Advance Sign in Klinger's email were lies. In addition to the evidence that Optec was not acting in good faith, Advance Sign presented the jury with evidence that Optec's Accounts Manager sent the email to Sonic's Vice President days after receiving a critical email from Wasserstrom. Furthermore, the jury could interpret Sonic giving Optec the installation business a couple of months after receiving the email as an indication that Optec intended to take the business from Advance Sign and was not protecting its reputation.

Finally, we assess the fifth factor—that Advance Sign was injured as a proximate result of Optec's act. It is generally true that, in order to establish proximate cause, one must show that the act, in a natural and continuous sequence, produces a result that would not have taken place without the act. *Strother v. Hutchinson*, 423 N.E.2d 467, 470–71 (Ohio 1981). Optec argues that Advance Sign has not established that it was injured as a proximate result of Klinger's email because Sonic representatives testified that Optec had not interfered with Sonic's business relationship with Advance Sign.

A reasonable jury could determine that Klinger's email was the proximate cause of Sonic's decision to remove Advance Sign from the installation process. Reed testified that he based his recommendation to remove Advance Sign from the installation process on Advance Sign's performance during the initial installations. He also testified that his only knowledge concerning Advance Sign's performance came from Klinger or

McHugh.  One could reasonably conclude that the email from Klinger formed the basis of Reed's opinion regarding Advance Sign's performance.

The jury reasonably concluded that Optec tortiously interfered with Advance Sign's business relationship with Sonic; therefore, the district court did not err in denying Optec's motion as to the tortious interference claim.

### III.

By way of a motion under Federal Rule of Civil Procedure 59, Optec claimed that the evidence did not support the jury's damages determinations with regard to both the breach of contract and tortious interference claims.

This Court reviews a Rule 59 motion under an abuse-of-discretion standard. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006).  We have interpreted Rule 59 to require a new trial only "when a jury has reach a 'seriously erroneous result' as evidenced by[ ] (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Id.* (quoting *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045–46 (6th Cir. 1996)).  Our review of a jury's damage award is extremely deferential, and we will not order a remittitur or new trial unless the award is contrary to all reason.  *Id.* at 413 (quoting *In re Lewis*, 845 F.2d 624, 635 (6th Cir. 1998)).  An award must stand unless it is: (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake.  *Gregory v. Shelby Cnty., Tennessee*, 220 F.3d 433, 443 (6th Cir. 2000) (citing *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996) (citation omitted)).

### A.     Contract Damages

The jury determined that the evidence supported granting Advance Sign $3,444,000 in damages for Optec's breach of the June 2006 commission agreement. The jury calculated the $3,444,000 damages figure by multiplying the approximate number of electronic messaging signs that Optec sold to Sonic at the time of trial—1,400—by

the net invoice price of an electronic messaging sign—$20,500—and then multiplying that number by the twelve percent commission rate—0.12—due to Advance Sign under the June agreement.  The basis for Optec's claim that it is entitled to a remittitur on damages is that the jury erred when it determined that the June 2006 agreement was valid and enforceable, and that as a result, the twelve percent commission rate was inapplicable to the damages calculation.  Optec does not argue that the jury's damages calculation was unreasonable if this Court were to assume that the June 2006 agreement was indeed valid and enforceable.  Given that we have already determined there was sufficient evidence to support the jury's determination that the June 2006 agreement was valid, Optec can no longer support its argument that the jury's damages calculation was unreasonable.

B.     Tortious Interference Damages

The jury determined that the evidence supported granting Advance Sign $1,029,000 in damages for Optec's tortious interference with Advance Sign's business relationship with Sonic.  The jury calculated the $1,029,000 damages figure by multiplying the number of electronic messaging signs that Optec sold to Sonic at the time of trial—1,400—by the average profit that Advance Sign made on each sign installation—$735.

Optec argues that the damages amount is beyond the range supportable by proof. There was no agreement in place between Advance Sign and Sonic or Advance Sign and Optec stating that Advance Sign would handle any installations going forward at the time that Sonic removed Advance Sign from the installation process.  Nevertheless, the record indicates that, prior to Optec taking over the installations, Advance Sign exclusively handled all installations for Sonic.  Furthermore, Advance Sign pitched the idea for the pilot project to Sonic and provided Optec with the connection to Sonic. Taking those facts into consideration, it is reasonable to conclude that, had it not been for Optec's interference, Advance Sign would have continued to be the exclusive installer of Optec's signs at Sonic restaurant locations for the duration of Sonic's

relationship with Optec.  The district court did not abuse its discretion in determining that the jury award was within the range supportable by proof.

We **AFFIRM** the district court judgment.