**CONTRACT DESIGN GROUP, INC.; Robert Murray, Plaintiffs–Appellees/Cross–Appellants,**

v.

**WAYNE STATE UNIVERSITY; Wayne State University Board of Governors; James R. Sears; Joan M. Gossman; John L. Davis, Defendants–Appellants/Cross–Appellees.**

Nos. 14–2148, 14–2206.

United States Court of Appeals, Sixth Circuit.

Dec. 16, 2015.

BEFORE: SILER, ROGERS, and STRANCH, Circuit Judges.

OPINION

JANE B. STRANCH, Circuit Judge.

Plaintiffs Contract Design Group and Robert Murray sued Wayne State University and other defendants alleging violations of substantive and procedural due process and equal protection under the United States Constitution, pursuant to 42 U.S.C. § 1983, and—under the Michigan Constitution—claims for intentional interference with business relations; account stated; and breach of contract. A jury found for Plaintiffs on the procedural due process claim and on the account stated and breach of contract claims. Defendants appealed: the trial court's denial of their post-trial motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and for a new trial or remittitur pursuant to Rule 59; their motion in limine to exclude Plaintiffs' expert witness; and the court's grant of attorneys' fees under 42 U.S.C. § 1988. Plaintiffs cross-appealed the court's denial of court reporter fees, witness fees, and copying costs under 28 U.S.C. § 1920.

Because the district court erred in denying the motion for judgment as a matter of law on the claim for breach of contract and abused its discretion in denying the motion for a new trial or remittitur on the claims for breach of contract and account stated, we **REVERSE IN PART** with respect to those claims, **VACATE** the court's award of attorneys' fees and costs, and **REMAND** the case for further proceedings consistent with this opinion, including a recalculation of fees and costs. We **AFFIRM** the district court's denial of Defendants' motions regarding the remaining issues.

## I. BACKGROUND

### A. Facts

Plaintiff Robert Murray is the owner of Contract Design Group (CDG), a commercial and residential floor covering company located in Royal Oak, Michigan. (R. 178, PageID 5669.) For over twenty years, Murray and CDG had an ongoing business relationship with defendant Wayne State University (WSU). (*Id.* at PageID 5670–71.) Problems arose in 2008 and 2009, however, when WSU became concerned that CDG was not in compliance with Michigan's prevailing wage law. (R. 20, PageID 156–57.) In August 2009, WSU suspended CDG from further work and withheld payment for 29 invoices that CDG had submitted for completed work. In October 2009, WSU terminated its 2008 contract with CDG, and in December it formally debarred CDG from bidding on future WSU projects. (R. 20, PageID 157–58; R. 179, PageID 5776–77, 5791, 5794, 5798, 5802.) Defendants and WSU employees James Sears, Joan Gossman, and John Davis participated in these decisions, after determining that CDG had not complied with the terms of the 2008 Contract—specifically that CDG had failed to produce evidence that it paid employees at Michigan's statutory prevailing wage rate. (R. 179, PageID 5791–92, 5799.) They also cited evidence of fraud by CDG. (*Id.* at 5792.) CDG disputed these allegations and WSU's actions, which severely impacted CDG's business. (*Id.* at PageID 5802.)

CDG had worked for WSU for several years under various contracts, but in the early 2000s WSU began requiring blanket contracts for routine construction jobs. (R. 178, PageID 5671.) The 2008 Contract at issue was signed in October 2008 by Murray and Davis, WSU's Vice President for Finance and Facilities Management, and was valid through September 2011. (R. 236–12, PageID 91.) It required CDG to work on a time and materials basis and to pay not less than the prevailing wage rate as set by the U.S. Department of Labor. (*Id.*) It required contractors and subcontractors to keep accurate records of wages paid and provide them to WSU upon request. (*Id.;* R. 195, PageID 6909.) The contract was open-ended, however, in that it lacked a specific scope of work or specifications for any particular project. (R. 236–12, PageID 91.)

Murray testified that despite the issuance of such blanket contracts, actual practices between contractors and WSU functioned differently. On individual projects, contractors, including CDG, routinely submitted estimates for lump sum amounts to George Dorset, WSU's Manager of Trades to the Facilities Department and later Director of Reimbursable Construction, who verbally approved such proposals. (R. 194, PageID 6688–89; R. 178, PageID 5683–90.) After the work was completed, the contractors submitted invoices, which were paid by WSU. (R. 178, PageID 5683–87; R. 179, PageID 5778–80.) Murray understood Dorset to function as WSU's project manager and to have authority to make final decisions regarding contracts. (R. 178, PageID 5695–97.) Dorset admitted that the use of such lump sum contracts was a long-term practice at WSU, despite the time and materials language in the 2008 Contract, because individual WSU clients wanted to know project costs beforehand. (R. 194, PageID 6710, 6713–14, 6759, 6767–69.) Although in his trial testimony Dorset characterized these lump sum contracts as formed under the auspices of the general blanket contract, he also admitted that he was processing individual contracts for specific jobs in "the way it's been done for a long time." (*Id.* at PageID 6769).

Sears, WSU's Assistant Vice President for Facilities Planning and Management (*id.* at PageID 6794), who directly oversaw Dorset, testified that Dorset ostensibly used the time and materials contracts but nevertheless persisted in receiving and paying invoices on a lump sum basis. (R. 196, PageID 6992–93.) Sears also admitted that WSU had determined that some of its contracts with CDG were separate lump sum contracts not associated with the 2008 Contract. (*Id.* at PageID 6992; R. 195, PageID 6941.) Sears explained that only he or Davis had the authority to sign such contracts. (R. 194, PageID 6801.) WSU eventually suspended Dorset in September 2009 and terminated him in November, for reasons including: mismanaging contracts, failing to require supporting documentation for invoices submitted, and soliciting kickbacks from contractors seeking WSU business. (R. 196, PageID 6993, 6999; R. 195, PageID 6923.)

In 2008, WSU became concerned that some of its contractors and subcontractors might not be complying with Michigan's Prevailing Wage Act and other labor laws. (R. 194, PageID 6812–13.) WSU began requiring contractors to submit certified payroll documentation before it would process their invoices. (*Id.* at 6815.) Sears had conversations with CDG and one other contractor, urging them to discontinue their use of subcontractors and to pay prevailing wage rates. (R. 195, PageID 6915.)

Murray testified that in August 2008, Dorset called and told him that WSU was

not going to provide CDG with any more work because CDG had not been paying the employer's matching Federal Insurance Contributions Act (FICA) contributions. (R. 179, PageID 5740.) Murray requested a meeting, at which he stated that CDG was not required to pay FICA on behalf of subcontractors because independent contractors were not CDG employees, (*id.* at 5741), but nevertheless began to submit certified payrolls to WSU. (*Id.* at 5743.) Randall Flaherty—a former CDG employee who had been fired for attempting to violate his non-compete agreement, (R. 195, PageID 6827, 6861)—testified that to comply with this requirement, CDG subcontractors sometimes submitted blank certified payrolls that another CDG employee then filled in to make it appear that the prevailing wage rate had been paid. (*Id.* at PageID 6840, 6847–48.) On November 25, 2008, CDG submitted materials to Dorset and WSU, explaining CDG's subcontracting practices. (R. 179, PageID 5748.) Murray and Dorset continued to correspond regarding WSU's requests for further documentation from CDG, (*id.* at PageID 5758, 5760–68), and WSU continued to award CDG and Murray contracts during this period. (*Id.* at 5776.)

On July 22, 2009, Flaherty, who had been in contact with Ray Williams of Williams Custom Carpeting, a former subcontractor for CDG (R. 195, PageID 6923–24; *id.* at PageID 6827, 6861), sent an anonymous email to Sears, alleging that CDG was in violation of the Prevailing Wage Act and that WSU "could lose State funding" if the "right people" found out. (*Id.* at PageID 6857–58; R. 196, PageID 6970–71.) Flaherty and Williams met with Sears on July 31 to discuss their allegations, bringing documentation that showed large profits and possible tampering with certified payrolls by CDG. (R. 195, PageID 6860, 6925, 6928–29.) Documentation sub-

mitted to WSU included handwritten notes by Williams—purporting to represent his recollection of work hours performed in the past—though when requested, he was unable to produce the work ledgers on which the notes were supposedly based. (R. 92, PageID 1415–17; R. 196, PageID 6975–76.) Both Williams and Flaherty admitted that they were attempting to solicit work from WSU themselves, and that they hoped to personally gain from CDG's and Murray's loss of WSU contracts. (R. 195, PageID 6860, 6861–64, 6870–72; R. 119–15, PageID 4382.) Sears testified that he discussed giving both men WSU contracts (R. 196, PageID 6982) and admitted that he later came to doubt both Williams's and Flaherty's honesty. (*Id.* at PageID 6985.)

Murray denied falsifying certified payroll records. (R. 179, PageID 5745–46.) Lisa Lazarevich, CDG's office manager, however, admitted that she altered paperwork—including certified payrolls submitted by subcontractors—although she denied falsifying such documents and claimed that her alterations were intended to correct the forms. (R. 193, PageID 6568–74.) Flaherty testified that Murray told him that the paperwork from the carpet installers needed to be filled out so that it showed they were being paid the prevailing wage or else the installers would be terminated; Flaherty indicated that such paperwork would necessarily be falsified because the installers were not paid the prevailing wage. (R. 195, PageID 6838–39, 6851.)

WSU's concerns over contracting practices and the prevailing wage came to a head in early August 2009, when WSU decided to suspend CDG from receiving new work orders. (*Id.* at PageID 6929–30.) WSU informed the Murrays—Robert as well as his brother and employee, Bill Murray—that CDG's business would be suspended until they submitted documen-

tation establishing compliance with the 2008 Contract's prevailing wage and other labor law requirements. (*Id.* at PageID 6934.) Multiple meetings took place and emails and letters were exchanged on these issues over the next two and a half months. (*Id.* at PageID 6934–35.) During this period, WSU declined to pay CDG for 29 invoices for work already completed—work done after CDG's November 2008 letter and prior to August 2009—claiming that the invoices lacked proper documentation. (R. 179, 5776–77; R. 195, PageID 6938–42.)

In an October 20, 2009 letter from Sears, WSU formally terminated its 2008 contract with CDG. (R. 179, PageID 5792; R. 196, PageID 7007–11.) CDG subsequently submitted a bid for another project at WSU but a WSU employee informed Murray that his bid would not be opened because he had been debarred from working for WSU. (R. 179, PageID 5795–97.) The employee showed Murray an October 28 letter signed by Gossman, WSU's Director of Purchasing, stating: "Wayne State is considering the debarment of Contract Design Group, Robert J. Murray, president, from participating in any bid process or contract award." (*Id.* at PageID 5798–99.) It listed the reasons for debarment as: "Failure to comply with the Prevailing Wage Act," "[e]vidence of fraudulent behavior," and "[b]reach of contract." (*Id.* at PageID 5799–5800; R. 15–3, PageID 116.) It gave the recipient 20 days to "submit in writing information in opposition to the proposed debarment" (R. 179, PageID 5800), and allowed 20 days to submit a written request for a meeting to discuss the proposed debarment, (R. 15–3, PageID 116).

In an email to Gossman regarding CDG and Murray's debarment, Sears indicated that a hearing would be a "complete waste of our time," given the information WSU believed it had concerning CDG's business practices. (R. 195, PageID 6943; R. 121–10, PageID 4513.) Sears also testified that he had "clearly indicated information" that was requested of CDG in the months following their suspension in order to be paid for past work. (R. 195, PageID 6944.) Gossman responded that they had to follow the debarment policy and permit an appeal process to place Murray's name officially on the website as debarred. (R. 121–10, PageID 4513.)

In correspondence with Anthony Vittiglio, CDG's attorney, Linda Galante, WSU's Assistant General Counsel, declined to postpone the hearing until after CDG's Freedom of Information Act request was completed, listed possible meeting times, and declined to produce the evidence on which the charges were based, other than a sampling of CDG invoices. (R. 15–4, PageID 119–20.) A subsequent letter from Galante to Vittiglio referred to documents—samples of which were provided to CDG—showing that employees of Williams's company, a subcontractor for CDG, were not paid the prevailing wage. (R. 119–12, PageID 4374.) In an email, Galante clarified that the hearing was "not a legal proceeding," that lawyers could attend but not participate, and the meeting could not be recorded. (R. 241–21, PageID 9776–77.) Vittiglio responded, objecting to the process and disputing whether it was a part of WSU's debarment policy. (*Id.* at PageID 9776.)

On December 7, a meeting on CDG's debarment was held, attended by Sears, Gossman, Galante, Bob and Bill Murray, and Vittiglio. (R. 195, PageID 6944–46.) Sears testified that CDG did not present any new documentation at the meeting that would enable WSU to pay CDG for past invoices. (*Id.*) In a December 16 letter signed by Gossman, WSU formally debarred Murray and CDG from working

for WSU for three years, citing CDG's violation of the Prevailing Wage Act and the requirements of the 2008 Contract and citing evidence of fraudulent behavior, namely falsification of certified payrolls. (R. 236–36, PageID 92.)

Upon receiving a complaint regarding CDG, Tara Bride, an investigator with Michigan's Wage & Hour Division of the Department of Energy, Labor & Economic Growth, stated in a March 15, 2010 letter that CDG had not violated the Prevailing Wage on State Projects Act, because there was no "employer/employee relationship between" CDG and its subcontractor, Williams Custom Carpet, (R. 15–1, PageID 112; R. 178, PageID 5643–44), and that her office had no jurisdiction over the complaint. (R. 178, PageID 5649–54.) The complaint had been filed by Williams, the subcontractor at issue who was one of the "whistleblowers" who brought evidence of CDG's alleged violations of the Prevailing Wage Act to WSU's attention. (R. 15–1, PageID 112.) Bride's letter was copied to Murray and CDG as well as WSU. (*Id.*)

### B. Procedural History

Murray and CDG filed suit against WSU, Sears, Gossman, and Davis. (R. 20, PageID 159–66.) Prior to trial, the district court entered partial summary judgment for WSU on Plaintiffs' substantive due process and equal protection claims under the United States and Michigan Constitutions. (R. 126, PageID 4590–91.) The court also granted summary judgment on Murray and CDG's claim for intentional interference with business relations, but only on their assertion of Defendants' malice, holding that the issue would proceed to trial on defamation. The court otherwise determined that issues of material fact remained on the remaining claims. Prior to trial, the district court denied Defendants'

motion in limine to strike the testimony of Plaintiffs' purported expert.

After a trial lasting over three weeks, the jury found for Murray and CDG, determining that: (1) Defendants violated CDG and Murray's procedural due process rights, awarding Murray $100,000 in compensatory damages; (2) CDG established an account stated, awarding $200,000 in damages; and (3) WSU breached its contract with CDG, awarding $250,000 in damages. (R. 202, PageID 7454–59.) The court then granted Plaintiffs' motion for nominal damages of $1.00 on CDG's procedural due process claim. (R. 248, PageID 9999.) The court also awarded: attorneys' fees and expenses pursuant to 42 U.S.C. § 1988 totaling $720,367.69; costs of $390.00 pursuant to 28 U.S.C. § 1920; and pre-judgment interest totaling $111,305.47. (R. 266, PageID 10450–52.) The total judgment for Plaintiffs was $1,382,064.16, plus post-judgment interest. (*Id.* at PageID 10452.)

Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and for a new trial or remittitur pursuant to Federal Rule of Civil Procedure 59, but the district court denied both motions. (R. 217; R 218; R. 260, PageID 10343.) The court also denied Defendants' motion for an order for limited discovery related to attorneys' fees while denying Plaintiffs' motion for costs pertaining to service, court reporter, and witness fees, and copying costs. (R. 262, PageID 10358; R. 263, PageID 10362; R. 261, PageID 10347–49.) Defendants timely appealed, and Plaintiffs cross-appealed. (R. 267; R. 271.)

## II. DISCUSSION

### A. Rule 50(b) Motion For Judgment As A Matter Of Law

Defendants contend that they are entitled to judgment as a matter of law on

Plaintiffs' claims for account stated and breach of contract for at least two reasons. First, Defendants argue that the breach of contract claim merged into the account stated claim under Michigan law, meaning that Plaintiffs cannot recover for both claims. Second, Defendants maintain that judgment as a matter of law is required with respect to these claims because Dorset lacked authority to bind WSU by his actions.[1]

### 1. *Standard Of Review*

This panel reviews de novo a district court's denial of a party's Rule 50(b) motion for judgment as a matter of law. *Advance Sign Grp., LLC v. Optec Displays, Inc.*, 722 F.3d 778, 783 (6th Cir.2013); *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir.1996). Rule 50 provides that a court may grant judgment as a matter of law on a particular issue "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed.R.Civ.P. 50(a)(1). Where, as here, a post-trial Rule 50(b) motion is "based on purely legal grounds" we must "take the jury's findings at face value." *K & T Enters., Inc.*, 97 F.3d at 175.

### 2. *Analysis*

#### a. *Whether CDG's Account Stated And Breach Of Contract Claims Merged*

■ In *Fisher Sand & Gravel Co. v. Neal A. Sweebe, Inc.*, 494 Mich. 543, 837 N.W.2d 244 (2013), the Michigan Supreme Court characterized an "account stated" claim in the following terms:

> If a claimant renders an account and it is assented to as correct by the other party with an express or implied promise to pay, an action may be maintained on the promise. *The account stated is a new, independent cause of action superseding and merging the antecedent causes of action represented by the particular items included in the computation.*

*Id.* at 253 (emphasis in original) (quoting 13 Corbin, Contracts § 72.4 (rev. ed.)). This means that if a court issues a judgment of account stated, "a second cause of action on an alternative theory of recovery for the same transaction[s] *cannot* be brought" or maintained. 13 Corbin, Contracts § 72.4 (rev. ed.) (emphasis in original).

The record here reflects that Plaintiffs consistently argued their account stated and breach of contract claims in the alternative. The First Amended Complaint alleges that the claim for account stated is based on $143,837.19 allegedly owed by WSU to CDG for work performed "on a lump sum basis, outside of the BPO [blanket purchase order, or 2008 Contract]," as evidenced by "Exhibit 1, Affidavit." (R. 20, PageID 165.) Plaintiffs asked for judgment "in the amount of $143,837.19, together with interest, costs and attorney[ ]s['] fees." (*Id.*) The breach of contract claim likewise is based on the same "individual Lump Sum Contracts referenced in Exhibit 1," which CDG claims WSU "wrongfully terminated" and "breached" by failing to pay the amounts

---

1. Plaintiffs argue that Defendants waived their challenges to the district court's denial of their motions under Rules 50(b) and 59 by failing to object to the jury verdict form, which listed the claims for account stated and breach of contract independently, or to request any kind of jury corrective instruction, or raise the issue before the jury was excused. Plaintiffs' waiver arguments are misguided. Defendants challenge the denial of their motions for a new trial or remittitur and judgment as a matter of law, all of which we address on the merits.

due. (*Id.* at PageID 165, 166.) The breach of contract claim referred to damages including "loss of the use of the amounts owed, lost profits, and other related and consequential damages." (*Id.* at PageID 166.)

The Affidavit referenced in both claims is that of Lisa Lazarevich, CDG's Administrative Manager, and in it she states that CDG "rendered flooring services to [WSU] on an open account[,]" "the account became stated between the parties[,]" and CDG delivered the goods and services but WSU did not pay. (R. 20–1, PageID 167.) The Affidavit states that the amount due is $143,837.19, and an attached "Wayne State University" "Statement of Account" compiled by CDG shows a list of job numbers with corresponding buildings, invoice dates, sale amounts, and a balance due of $143,837.19. (*Id.* at PageID 167, 169.)

During opening argument at trial, Plaintiffs' counsel referred to the existence of "a lump sum contract" stating that such contracts were how CDG and WSU had done business for years. (R. 178, PageID 5597.) While the 2008 Contract covered no specific scope of work, Plaintiffs argued, it appeared to give contracting authority to the project manager, Dorset, who in turn had formed "lump sum agreements" "however he wanted" in accordance with longstanding WSU practice. (*Id.* at PageID 5611.) Plaintiffs' counsel's closing argument made it clear that the jury could find that these lump sum orders either were placed under the auspices of the 2008 Contract, or were separate contracts formed with Dorset, and that WSU regularly honored such contracts for completed work, despite their irregular formation. (R. 211, PageID 7692–96.) Regardless of the legal theory—account stated or breach of contract—Plaintiffs' counsel argued during closing that WSU owed CDG $143,837 for the completed and unpaid work:

> Did [CDG] state an account for these, for these invoices? Yes.
>
> Did Wayne State fail to pay it and therefore Contract Design Group sustained damages? Yes.
>
> Amount: $143,837.
>
> Breach of contract, did Wayne State breach the contract to pay these, for these items? Yes.
>
> Did Contract Design Group suffer damages? Yes.
>
> And, and what's the amount of the damages, [$]143,837.

(*Id.* at PageID 7732.) The Jointly Proposed Jury Instructions, however, were not clear that these claims were being made in the alternative. (R. 204, PageID 7530–31.) As a result of the parties' failure to clarify in the instructions and verdict form that Plaintiffs sought to recover the identical sum under two different legal theories, the jury awarded Plaintiffs $200,000 for the account stated claim and $250,000 for the breach of contract claim.

In its order denying Defendants' motion for judgment as a matter of law, the district court found that the $200,000 awarded for account stated was not duplicative of the breach of contract claim, reasoning that it reflected the jury's understanding that "the work on the account stated claim was done outside the blanket contracts[,]" and that the amount awarded in excess of $143,837 was intended as consequential damages. (R. 260, PageID 10339–40.) Plaintiffs argue that we, too, should adopt this reasoning. We are generally reluctant to overturn a jury verdict and usually defer to the district court's understanding of that verdict in its rulings on a party's motions pursuant to Rule 50(b). Nevertheless, the record compels the conclusion that Plaintiffs' claim for breach of contract merged with their claim for account stated and, consequently, Defendants are entitled

to judgment as a matter of law on the breach of contract claim.

· Given the present record, it is clear that Plaintiffs argued the account stated and breach of contract claims in the alternative in an effort to recover the same sum: $143,837.19. When the jury found for Plaintiffs on the account stated claim, it thereby "supersed[ed] and merg[ed] the antecedent causes of action represented by the particular items included in the computation" of the amount due. *Fisher Sand & Gravel Co.*, 837 N.W.2d at 253. Here those "particular items" are listed in the Wayne State University Statement of Account for $143,837.19, and are also the lump sum contracts referred to in the breach of contract claim as stated in the First Amended Complaint. (R. 20, PageID 165–66; R. 20–1, PageID 169.) The district court erred insofar as it found that these claims did not merge and thereby allowed a double recovery for Plaintiffs. Accordingly, we reverse and remand on this issue.

### b. Whether Dorset Had Authority To Bind WSU By His Actions

■ Defendants also argue that the district court should have granted their Rule 50(b) motion for judgment as a matter of law on the account stated and breach of contract claims because George Dorset lacked authority to enter into any contract on behalf of WSU, and so could not have formed contracts that might serve as the basis for either claim.[2] Plaintiffs respond that Defendants waived this argument because they did not advance it in a preverdict motion and therefore failed to preserve the argument.

We previously have held that "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted

only on grounds advanced in the preverdict motion." *Hometown Folks, LLC v. S & B Wilson, Inc.*, 643 F.3d 520, 527 (6th Cir.2011). Defendants claim that they preserved the Dorset argument in their Rule 50(a) motion for a directed verdict during trial. In that motion, however, Defendants argued only that Plaintiffs had not produced any evidence of the separate contracts underlying the claim that Plaintiffs had additional lump-sum contracts with WSU, and that there was no consideration for any of these separate contracts. (R. 193, PageID 6663.) Defendants did not argue that any such lump sum contract would be invalid because Dorset lacked authority to enter into contracts on WSU's behalf. Even though Plaintiffs responded to the instant Rule 50(b) motion by arguing that testimony showed that "these orders were simply placed by Wayne State, by George Dorset and others, specifically seeking work at a particular amount," Defendants · did not contest the formation of such contracts on the ground that Dorset lacked authority.· (*Id.* at PageID 6666–67.) Defendants point to no other instances in which they raised the issue prior to their post-trial motions. Given this record, Defendants waived the argument that the breach of contract claim fails because Dorset lacked express authority to act on behalf of WSU.

### B. Rule 59 Motion For A New Trial Or Remittitur And Motion In Limine To Strike Expert Testimony

With respect to their Rule 59 motion, Defendants argue that they are entitled to a new trial or remittitur because: (1) Plaintiffs may not recover for their breach of contract *and* account stated claims under Michigan law; (2) the damages awarded to Plaintiffs for those claims and for the

---

**2.** The district court's order did not specifically address the argument regarding Dorset's authority to enter into such contracts, but still

denied the motion in its entirety. (R. 260, PageID 10343.)

due process emotional distress claim were excessive; and (3) the district court improperly admitted expert testimony regarding the emotional distress claim. Defendants also challenge the district court's denial of their motion to strike the testimony of Plaintiffs' expert.

### 1. *Standard Of Review*

We review a denial of a Rule 59 motion for a new trial or remittitur for an abuse of discretion. *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 414 (6th Cir.2012); *Mid–Michigan Comput. Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 509 (6th Cir.2005). In this context, "[a]n abuse of discretion occurs when the district court relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir.2006); *see also Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir.1994) ("We will find an abuse of discretion only when the Court has a definite and firm conviction that the trial court committed a clear error of judgment."). Rule 59 provides that, "after a jury trial," a "court may, on motion, grant a new trial on all or some of the issues" "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R.Civ.P. 59(a)(1). We have interpreted this Rule to require a new trial only "when the jury reaches a seriously erroneous result as evidenced by (1) the verdict being against the [clear] weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Static Control Components, Inc.*, 697 F.3d at 414 (alteration in original) (quoting *Mike's Train House, Inc.*, 472 F.3d at 405). With respect to remittitur, we have held that district courts must let a jury's award for damages "stand unless [the award] is (1)

beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake." *Wallace v. FedEx Corp.*, 764 F.3d 571, 593 (6th Cir. 2014). This is consistent with the Michigan standard, which reviews purportedly excessive jury verdicts by considering, among other factors, "whether the verdict was the result of ... mistake of law or fact." *Gilbert v. DaimlerChrysler Corp.*, 470 Mich. 749, 685 N.W.2d 391, 400 (2004) (quoting *Palenkas v. Beaumont Hosp.*, 432 Mich. 527, 443 N.W.2d 354, 356 (1989)).

We also review the district court's decision regarding the admissibility of expert evidence for an abuse of discretion. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 276 (6th Cir.2014). "[W]e will not substitute our own judgment for that of the district court and will reverse an evidentiary decision only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir.2008) (alteration in original). The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and informed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The trial court is entrusted with assessing whether the testimony is "not only relevant, but reliable." *Kumho Tire Co.*, 526 U.S. at 147, 119 S.Ct. 1167.

### 2. *Analysis*

*a.   Whether Remittitur Or A New Trial Is Appropriate With Respect To CDG's Claims For Account Stated And Breach Of Contract*

■ Because Defendants were entitled to judgment as a matter of law on the

breach of contract claim, the district court should have granted Defendants' motion for a new trial or remittitur with respect to the jury's award for breach of contract because the award was "the result of a mistake[,]" *Wallace,* 764 F.3d at 593, and the court "improperly applie[d] the law," *Mike's Train House, Inc.,* 472 F.3d at 405. Defendants also argue that the court abused its discretion by denying a new trial or remittitur with respect to the account stated claim because the award for that claim improperly exceeded Plaintiffs' requested amount. An account stated claim is simply a claim to recover an unpaid balance. *See Keywell & Rosenfeld v. Bithell,* 254 Mich.App. 300, 657 N.W.2d 759, 777 (2002) ("[A]n account stated [is] 'a balance struck between the parties on a settlement[.]' "). Plaintiffs requested only $143,837.19 on the claim because that was the amount owed them by WSU for work performed by CDG, either under lump sum agreements or the 2008 Contract. Consequential damages could not have been awarded on the account stated claim, both because Plaintiffs failed to request such damages and the jury was not instructed that it could find such damages. The district court abused its discretion regarding the motion for a new trial or remittitur, as here the evidence demonstrates that such an award was the result of jury "mistake." *Wallace,* 764 F.3d at 593. And because the defect in this award is " 'readily identified and measured,' remittitur is more appropriate than a new trial." *Strickland v. Owens Corning,* 142 F.3d 353, 359 (6th Cir.1998) (quoting *Kolb v. Goldring, Inc.,* 694 F.2d 869, 875 (1st Cir.1982)). Consequently, we reverse on this issue and remand with instructions to remit the award on the account stated claim to reflect the $143,837.19 in damages that Plaintiffs originally requested and that the jury was instructed it could award.

*b. Whether The Jury's Award With Respect To Murray's Due Process Claim Was Excessive Or Unsupported By Evidence*

■ Defendants further argue that the district court erred in denying their motion for a new trial or remittitur with respect to Murray's due process claim for emotional distress because the evidence did not support an award of $100,000 in damages stemming from procedural deficiencies in Murray and CDG's debarment by WSU. Specifically, Defendants argue that Murray alleged emotional distress resulting only from his debarment and alleged defamation by WSU, not as a result of lack of due process itself, and that the award was excessive. Plaintiffs argue that Murray's emotional distress arose from the unconstitutional debarment process itself, which authorizes a procedural due process claim for emotional distress damages.

"[M]ental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983," although "the injury caused by a justified deprivation, including distress, is not properly compensable under § 1983." *Carey v. Piphus,* 435 U.S. 247, 263, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Defendants cite *Sutton v. Cleveland Board of Education,* 958 F.2d 1339 (6th Cir.1992), for the proposition that "where a deprivation is justified but the procedures are deficient, the distress a person feels may be attributable to the justified deprivation rather than to deficiencies in procedure[,]" and thus "a plaintiff is required to convince the trier of fact that he actually suffered distress because of the denial of procedural due process itself." *Id.* at 1352. Defendants argue that the jury's decision to not award damages to CDG for its procedural due process claim meant that it found only

234

the process to have been deficient but the debarment itself to be justified.

The record does not establish that the jury found Murray's deprivation to be justified, and trial testimony provides the requisite causation linking the deficient debarment procedure and Murray's emotional distress. Regarding the "emotional impact of that [debarment] meeting and the subsequent debarment[,]" (R. 199, PageID 7380), Murray testified concerning: the abrupt notification by WSU that CDG and Murray were debarred from working there; the embarrassment he felt upon receiving that news in front of colleagues; how "things [were] falling apart" at work as he focused on the debarment; the anxiety as he and his brother frantically attempted to respond to the few documents WSU permitted them to see; and his frustration with WSU's resistance to letting them bring an attorney to record the meeting or see the evidence amassed against them. (*Id.* at PageID 7376–79.) At the meeting itself, Murray recalled his inability to do the presentation (which his brother Bill did for him); their decision to forge ahead even though they felt their cause was hopeless and that WSU's Gossman had already made up her mind; and Murray's incredulity when Gossman responded to CDG's presentation by opening a folder to reveal an outdated contract and insisting that they did not follow it. (*Id.*) Such evidence provides adequate grounds for a finding that Murray suffered emotional distress as a direct result of the deficient debarment procedure instituted by WSU.

The district court also emphasized Murray's general testimony regarding how "the denial of procedural due process rights caused [Murray's] business to suffer, which caused personal and business relationships to deteriorate[,]" and that he "sought professional counseling" as a result. (R. 260, PageID 10341.) In light of the entire record, the district court did not abuse its discretion in finding the jury's award to be reasonable—not excessive or otherwise against the weight of the evidence—and in denying Defendants' motion for a new trial or remittitur on this issue.

### c. Whether The Challenged Expert Testimony Was Admissible

Defendants argue that the district court abused its discretion in admitting the testimony of Plaintiffs' expert Ted Funke and in denying Defendants' various motions on this subject. Defendants maintain that Funke's methodology was based on unsupported assumptions regarding future profits and that Funke erroneously referred to gross rather than net profits in his testimony. They also argue that the erroneous admittance of Funke's testimony requires a new trial because it affected the jury's damage awards. Plaintiffs argue that Defendants waived these issues by lodging only a perfunctory objection to Funke's qualifications and failing to make contemporaneous objections to his methodology and use of gross profits. They otherwise argue that admission of Funke's testimony was not an abuse of discretion, and that any shortcomings in his testimony go to the weight rather than the admissibility of his testimony.

Pursuant to Federal Rule of Evidence 103(a), a claim of evidentiary error is preserved for admitted evidence where a party "timely objects or moves to strike" and "states the specific ground" for doing so, unless the ground is "apparent from the context[.]" Fed.R.Evid. 103(a)(1). Under Rule 103(b), "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed.R.Evid. 103(b). Although Plaintiffs are correct that there

is Sixth Circuit case law to the effect that a contemporaneous objection is required to preserve an error on appeal, "where a trial court has made a definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is subject to other circumstances or evidence, then counsel need not renew the objection at the time the evidence is offered at trial to preserve the error for appeal." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 791–92 (6th Cir.2002).

Prior to trial, Defendants submitted a Rule 26 and *Daubert* motion to strike Funke's expert report and testimony on the grounds that he failed to provide a basis for his opinions, was not specially qualified to testify, his proposed testimony was not based on sufficient facts or data, was not the product of reliable methodology, and that he did not reliably apply his methods to the facts of the case. (R. 107.) The court denied Defendants' motion, reasoning that Defendants had deposed Funke so they were aware of his opinions and had retained an expert to rebut his testimony, that Funke's opinions were in compliance with *Daubert*, and that any arguments against them went to the weight rather than the admissibility of the evidence. (R. 171, PageID 5363.) During trial, Defendants renewed their objection to Funke's qualifications to testify regarding lost profits—although not the substance of his testimony—and were denied. (R. 193, PageID 6629.) They later moved to strike Funke's testimony on the grounds that he testified regarding gross profits where the proper calculation should have been based on net profits, and that his opinion was based on speculation. (*Id.* at PageID 6676–77.) The court denied this motion when it was renewed toward the end of trial. (R. 199, PageID 7430.) Defendants' motion in limine to strike Funke's testimony, considered in combination with their motions to strike Funke's

testimony during trial, are sufficient to preserve their objections to the substance of his testimony on appeal. Defendants did not waive their objections to Funke's testimony.

Our court and others have excluded overly speculative expert testimony regarding lost profits. In *Multimatic, Inc. v. Faurecia Interior Systems USA, Inc.*, 358 Fed.Appx. 643 (6th Cir.2009), we found proper the exclusion of an expert witness on the issue of lost profits where his calculations involved a "ten-year prediction about the fortunes of the American automotive industry[.]" 358 Fed.Appx. at 654. We concluded that the opinion rested on speculation regarding profit margins, without a basis in historical or typical industry profit margins, as well as unsupported speculation concerning future demand for a product. *Id.* Similarly, in *MyGallons LLC v. U.S. Bancorp*, 521 F.Appx. 297, 306–07 (4th Cir.2013), the Fourth Circuit determined that an expert witness was improperly allowed to testify regarding lost profits where her expertise was in marketing rather than sales forecasting, she used industry giants rather than comparable startups as benchmarks in her analysis, and she did not consider the specific resources, financing or experience of the company or the real circumstances that could cause the company to eventually fail. Because the expert "ignored business realities and relied on sheer speculation[,]" the court concluded that her testimony should not have been admitted, vacated the award of damages and remanded for a new trial on damages. *Id.* at 307.d

The use of gross rather than net profits has also been found to be an inappropriate way of calculating lost profits. *See Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir.2004) (determining that the trial court did not abuse its discretion in striking lost profit

testimony based on gross sales and profit figures where Georgia law forbade such an estimate and the court determined that the expert had used a flawed methodology), *abrogated on other grounds by Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1258 n. 7 (11th Cir. 2010). Michigan case law suggests that damages for lost profits must be based on the loss of net rather than gross profits. *Getman v. Mathews,* 125 Mich.App. 245, 335 N.W.2d 671, 673 (1983) (determining that the court's failure to clarify to the jury that damages for lost profits may only be based on the loss of net rather than gross profits was erroneous and constituted reversible error); *but see Davidson v. Gen. Motors Corp.*, 136 Mich.App. 203, 357 N.W.2d 59, 61 (1984) (determining that trial judge's use of "variable gross profit" figures to calculate damages and grant remittitur was not improper where the judge found that loss "was equated to a loss of net profit," noting that while the result was likely inaccurate it was not likely to produce an excessive verdict).

At trial, Funke stated that his calculations were based exclusively on information given to him by Murray and CDG (R. 193, PageID 6630–34) and repeatedly characterized them as based on gross profits. Regarding damages, he testified that CDG incurred lost profits in the 41 months following the debarment of approximately $1,062,310. (*Id.* at PageID 6635.) He based his estimate on CDG's historical sales to WSU over the preceding eighteen months, multiplying average monthly grosses (equaling $25,910) by 41. (*Id.* at PageID 6635–36.) He then estimated lost gross profits of $253,790 for CDG's two commercial salesman, over the same 41–month period of debarment. (*Id.* at PageID 6636.) Funke also testified to a loss of entity value, multiplied the monthly losses by twelve to obtain a yearly lost income, and multiplied that total by a fac-

tor ranging from four to six to "capitalize the earnings" on that value, arriving at a total ranging between $1,540,848 and $2,311,272. (*Id.* at PageID 6636–37.)

On cross-examination, Funke admitted that he never calculated the net because "[t]here's no net out of a job cost, there's just a gross profit" (*id.* at PageID 6641), and defended his method by pointing out that "[i]t depends on how you view the overhead of the entity for the years in question," (*id.* at PageID 6642). He also admitted that he did not analyze the actual contract between CDG and WSU, nor compare the stated profits to the contract terms, and that he relied on Bill Murray's representations explaining CDG's abnormally high gross profits. (*Id.* at PageID 6642–44.) When questioned about projected future dealings between CDG and WSU, Funke stated that he assumed that the historical pattern of dealings between the two parties would continue into the near future, regardless of the contract terms. (*Id.* at PageID 6647.) He did not look at WSU's actual purchases over the 41–month period because he did not receive that information, although he testified that he asked for it. (*Id.* at PageID 6648.) He also admitted that he did not have the accounting information for CDG prior to 2010, as that had not been given to him by CDG's prior accountant. (*Id.* at PageID 6649.) Funke explained that he took into account risk factors regarding future transactions by using a lower capitalization rate rather than a discount rate. (*Id.* at PageID 6652.) He also stated that he used the capitalization rate appropriate to industry standards for the metropolitan Detroit area. (*Id.* at PageID 6654–55.)

This issue presents a close call. Defendants argue that Funke's testimony was speculative and merited exclusion insofar as Funke assumed that CDG would have continued to work for WSU despite the

revelations regarding CDG's probable fraud before and after Dorset's termination, did not take into account factors such as the economic downturn or the orders actually placed with other contractors by WSU during the period after CDG's debarment, or account for risk generally. Defendants also point out that Funke's reliance on gross profits to calculate damages was evidence of a flawed methodology. However, unlike the expert in *Multimatic,* Funke based his future projections on historical dealings between CDG and WSU, and projected into a limited future of 41 months. And unlike the expert in *MyGallons,* Funke based his projections for lost profits on both past profits and estimated various projected earnings, taking into account varying levels of risk. His reliance on gross profits is most troubling, but Funke addressed the reasons for his methodology on cross-examination, and Defendants' own expert offered a persuasive counterargument.

Funke's testimony was hardly a model of precision. Even as the district court denied Defendants' motion to strike, it admitted that "I wouldn't say that he was the best expert," while relying on the prior judge's ruling admitting the testimony. (R. 199, PageID 7430.) Ultimately, Funke's failure to consider certain factors—such as CDG's probably fraudulent billing practices—could reasonably have been understood to go to weight rather than admissibility. Where "the jury was free to give [an expert's] opinion little or no weight, and to credit instead Defendants' attacks on his decision[s,]" and the expert apparently used a generally reliable method and applied it to the facts of this case as he understood them, the court does not necessarily abuse its discretion in admitting the testimony. *In re Scrap Metal Antitrust Litig.,* 527 F.3d at 531. Funke's calculations were scrutinized on cross-examination and critiqued by Defendants'

own expert. In this context, the jury could weigh his testimony accordingly, and apparently it did so. The only damages it awarded on the procedural due process claim were awarded to Murray personally, apparently based on his emotional distress rather than lost profits. (R. 260, PageID 10340–41.) In sum, the record suggests that the jury performed its proper function in evaluating such "shaky but admissible evidence[,]" *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786 and that the district court did not abuse its discretion in permitting it to do so.

### C. Fee Awards

#### 1. *Attorneys' Fees And Costs Under 42 U.S.C. § 1988*

Defendants argue that the district court abused its discretion in awarding attorney fees of $686,784 and costs totaling $33,583.69 under 42 U.S.C. § 1988 to CDG and Murray jointly for the services related to all claims. We need not reach the merits of Defendants' arguments, however, because our rulings with respect to the claims for account stated and breach of contract lead us to vacate the court's award under § 1988 and remand for reconsideration consistent with this panel's opinion. We remand the case to the district court for determination in the first instance.

#### 2. *Court Reporter Fees, Witness Fees, And Copying Costs Under 28 U.S.C. § 1920*

Plaintiffs cross-appealed, arguing that the district court erred when it denied their request for specific court reporter fees, witness fees, and copying costs under 28 U.S.C. § 1920. Plaintiffs submitted a bill of costs, and the clerk denied $18,532.23 in court reporter fees, $483.78 in witness fees, and $2,928.83 in copying

costs, citing a lack of documentation as required by the Eastern District of Michigan's Bill of Costs Handbook. (R. 214; R. 216.) Plaintiffs then filed a motion for the court to review the clerk's taxation of costs. (R. 223.) The district court denied the motion (R. 261), and Plaintiffs now appeal.

### a. Standard Of Review

The district court's award of costs is reviewed for an abuse of discretion. *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 827 (6th Cir.2013). "The award of statutory costs is a matter for the district court, in its best judgment as to what was reasonable and necessary, and the appellate courts will not normally interfere with the exercise of that discretion." *Id.* (quoting *Sigley v. Kuhn*, 2000 WL 145187, at *8 (6th Cir.2000)). An abuse of discretion occurs only if this panel has a "definite and firm conviction that the trial court committed a clear error of judgment." *Singleton v. Smith*, 241 F.3d 534, 538 (6th Cir.2001) (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir.1996)).

### b. Analysis

Pursuant to 28 U.S.C. § 1920, a district court may tax as costs "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case;" "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;" and "[f]ees ... for ... witnesses[.]" 28 U.S.C. § 1920. Eastern District of Michigan Local Rule 54.1 provides that "[t]he clerk will tax costs under Fed[eral] R[ule of] Civ[il] P[rocedure] 54(d)(1) as provided in the Bill of Costs Handbook available from the clerk's office and the court's web site." E.D. Mich. LR 54.1.

The district court's order denying court reporter fees for $18,532.23 explained that the "Bill of Costs [H]andbook directs counsel to inform the clerk of the title of the motion that transcript supports or the date on which it was read into the record." (R. 261, PageID 10347.) The court found that "Plaintiffs failed to do this for their deposition transcripts[,]" and instead "submitted several invoices to the clerk." (*Id.*) It reasoned that because Plaintiffs did not follow the Bill of Costs Handbook instructions as required by the local rules, the court would not tax the costs of transcripts, as doing so "would undermine the rules in the Court's Bill of Costs Handbook." (*Id.* at PageID 10348.) The court also denied Plaintiffs' request for witness fees totaling $483.78, observing that "Plaintiffs failed to specify whether the witnesses testified at trial or whether their deposition was used at trial or in a motion[,]" and so failed to follow the Bill of Costs Handbook requirement for such documentation. (*Id.*) Finally, the court denied Plaintiffs' request for $2,928.83 in copying costs, insofar as the "Bill of Costs Handbook states [that] such costs are 'not recoverable within the discretion of the taxation clerk unless counsel has previously secured an order authorizing [their] recovery[.]' " (*Id.* (alterations in original) (quoting E.D. Mich. Bill of costs Handbook, § II F).) Because no such order had been issued, the court deemed that "the clerk correctly denied copying costs as a taxable cost." (*Id.* at PageID 10349.)

Plaintiffs argue that they submitted all of the necessary documentation regarding their court reporter fees and witness fees in their Motion for Taxation of Costs and Review of Clerk's Taxation of Costs, where they showed in their briefing that $16,728.32 in costs for transcripts pertained to transcripts used in support of a motion or at trial. (R. 223, PageID 8099–100.) They argue that this evidence

should have been sufficient for the court, upon de novo review of the clerk's taxation of costs, to overrule the clerk's taxation of costs. *See BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 405 F.3d 415, 418–19 (6th Cir. 2005) (observing that any decision by a clerk regarding costs is subject to de novo review by the district court), *abrogated on other grounds by Taniguchi v. Kan Pacific Saipan, Ltd.*, —— U.S. ——, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012). Plaintiffs argue that the district court's record was not limited to materials presented to the clerk; however, the authority they cite does not support this proposition. With regard to the requirement of an order authorizing recovery of copying costs, Plaintiffs also rely on *In re Ricoh Co. Patent Litigation*, 661 F.3d 1361 (Fed.Cir. 2011), for the proposition that "local rules cannot render disallowable costs otherwise allowable under section 1920." *Id.* at 1370 n. 5. However, there is no evidence that Local Rule 54.1 or the Bill of Costs Handbook incorporated into the rule disallows any costs allowable under § 1920—rather, the Handbook simply places a precondition on the recovery of such costs.

The district court did not abuse its discretion when it determined that Plaintiffs failed to comply with Local Rule 54.1 and so could not be reimbursed for the costs at issue. *See Segovia v. Montgomery Cty.*, 593 Fed.Appx. 488, 493 (6th Cir.2014) (holding that the district court did not abuse its discretion in denying costs based on a party's failure to comply with a local

rule requiring a timely filing of a Bill of Costs and supporting documentation within 30 days).[3]

## III. CONCLUSION

For the foregoing reasons, we **REVERSE IN PART** and **AFFIRM IN PART,** and **REMAND** to the district court for further proceedings in accordance with this opinion.

---

**3.** Plaintiffs also argue that when they filed their motion for attorneys' fees under 42 U.S.C. § 1988, the accompanying memorandum of law noted that their Motion for Taxation of Costs and Review of Clerk's Taxation of Costs was pending and so requested "recovery of these same expenses under § 1988." (R. 234, PageID 8590.) However, Plaintiffs made a single reference to this request and attached no supporting documentation. The district court did not respond to this argu-

ment in its order. (R. 262.) Because Plaintiffs failed to properly raise this issue in the district court, we cannot address it now on appeal. "[V]ague references to an issue fail to clearly present it to the district court so as to preserve the issue for appeal." *Knall Beverage, Inc. v. Teamsters Local Union No. 293 Pension Plan*, 744 F.3d 419, 424 (6th Cir. 2014) (alteration in original) (quoting *Thurman v. Yellow Freight Sys., Inc.*, 97 F.3d 833, 835 (6th Cir.1996)).